UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8 17 2015

------------------------------------------x
                                          :
GOODWORLDCREATIONS LLC d/b/a/             :
CROWDNETIC,                               :
                                          :
                Plaintiff and             :          14 Civ. 3848 (TPG)
                Counterclaim Defendant,   :
                                          :          **OPINION**
             - against -                  :
                                          :
                                          :
DARA ALBRIGHT,                            :
                                          :
                Defendant and             :
                Counterclaim              :
                Plaintiff,                :
                                          :
             - against –                  :
                                          :
ALICE COX a/k/a LUAN COX,                 :
                                          :
                Counterclaim              :
                Defendant                 :
                                          :
------------------------------------------x

        This case involves the putative interests of defendant Dara Albright in a company called

NowStreet LLC.  In January 2014, Albright sold NowStreet to plaintiff GoodWorldCreations,

LLC, d/b/a Crowdnetic ("Crowdnetic"), a company founded by counter-defendant Alice Cox

("Cox").  A dispute about the terms of that sale, as well as a purported employment agreement

between Crowdnetic and Albright, gives rise to the complaint and counterclaim before the court.

        Crowdnetic moves for declaratory judgment, pursuant to 28 U.S.C. § 2201, that

Crowdnetic, not Albright, is the rightful owner of NowStreet, and that Albright has no right to

rescind Crowdnetic's purchase of NowStreet.  Crowdnetic also seeks millions of dollars in

1

compensatory and punitive damages for (1) tortious interference with contract; (2) tortious interference with business relations; (3) conversion; (4) civil trespass to chattel; and (5) a faithless act.

Albright has moved to dismiss Counts II and III of the complaint—the claims for tortious interference with contract and tortious interference with business relations. (Dkt. No. 33.). Albright has also filed a twice-amended counterclaim against Crowdnetic and Cox. (Dkt. No. 31.) As a counterclaimant, Albright brings claims for breach of contract, common law fraud, securities fraud, and tortious interference with business relations. Crowdnetic has moved to dismiss the entirety of Albright's counterclaim.

For the reasons that follow, Albright's motion to dismiss the complaint is denied. Crowdnetic's motion to dismiss the counterclaim is granted in part and denied in part.

## THE COMPLAINT AND COUNTERCLAIM

The followings facts are drawn from the First Amended Complaint and the Second Amended Counterclaim, and are assumed to be true for purposes of the instant motions.

### A. The Complaint

Plaintiff Crowdnetic is a limited liability company with offices in this district. Crowdnetic is "a provider of technology and market data solutions to the global crowdfinance marketplace." (Dkt. Nos., 23, First Amended Complaint ("FAC") ¶ 13.) Crowdfinance "refers to a relatively new funding approach intended to enable business ventures to raise capital . . . through social media websites and through financial network websites focused on accredited investors ('networks')." (FAC ¶ 12.) Counter-defendant Alice Cox is a resident of New York, and is the founder and CEO of Crowdnetic.

2

NowStreet is a Georgia limited liability company that provides an informational platform for the crowdfinance industry through various channels. It includes an internet blog started by Albright.

Defendant Albright is a resident of Georgia. Prior to the execution of a Membership Interest Purchase Agreement (the "Purchase Agreement"), Albright was the sole member, and 100% owner, of NowStreet. However, pursuant to the Purchase Agreement, dated as of August 1, 2013 and effective as of January 1, 2014, Albright sold her interest in NowStreet to plaintiff for $5,000. (FAC ¶ 19.) The Purchase Agreement includes a merger clause, which states: "This agreement supersedes all prior discussions and agreements among the parties with respect to the subject matter hereof and thereof and contains the sole and entire agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof." (Purchase Agreement ¶ 4.3.)

At the time the Purchase Agreement was executed, NowStreet's assets included a 1/3 membership interest in a Delaware limited liability company called LendIt Conference, LLC ("LendIt"). LendIt owns the rights to the "LendIt Conference"—a leading conference in the global lending industry which "addresses both consumer and small business lending, and aims to introduce people to the latest online lending platforms[.]" (FAC ¶ 16.)

In May 2014, the second annual LendIt Conference was held in San Francisco, with increased attendance (and corresponding profits) as compared to the 2013 LendIt Conference. Crowdnetic claims that both before and after the conference, Albright actively worked against its interest by telling investors involved in the LendIt Conference or general crowdfinance space that Albright—not Crowdnetic—controlled the rights to own or manage NowStreet and its interest in the LendIt Conference. Albright allegedly did so by, among other things, changing

3

passwords to remove Crowdnetic's access to LendIt's online files and social media accounts. (FAC ¶¶ 36-45.) Albright then further moved "to sabotage Crowdnetic's business and business relations" on May 13, 2014—one week after the LendIt conference—when Albright "demanded that the parties 'unwind' the Purchase Agreement pursuant to which Crowdnetic had purchased Albright's interests in NowStreet, so that ownership of NowStreet (and its 1/3 interest in LendIt) would be restored to her." (FAC ¶ 53.) Albright also informed third parties, including a news source called "Lend Academy," that she was unwinding the transaction with Crowdnetic and therefore maintained full ownership and control over NowStreet. Crowdnetic claims Albright's actions were driven in part by the success of the 2014 LendIt Conference, which led her to experience seller's remorse after realizing she had sold her 1/3 interest in the LendIt Conference profits to plaintiff for far less than the profits actually earned by LendIt.

According to Crowdnetic, in the last half of 2013, "the parties also discussed the possibility of Albright's becoming an employee of Crowdnetic and being granted an option to purchase units in plaintiff." (FAC ¶ 23.) Crowdnetic adds that in January 2014, "Albright executed a Unit Option granting her options to purchase a specified number of units in Crowdnetic, vesting of which options was contingent upon her being employed by Crowdnetic." (FAC ¶ 24.) However, Crowdnetic claims that "in March 2014, [Albright] indicated to Crowdnetic that she did not want to become an employee and instead wished to be a consultant," and that Albright ultimately did not sign a proposed Consulting Agreement or revised Unit Option Agreement. (FAC ¶¶ 25-27.)

### B. The Counterclaim

Albright tells a different story. In her Second Amended Counterclaim, filed against Crowdnetic and its CEO, Alice (Luan) Cox, Albright claims to be the victim "of deception and

4

betrayal by Cox and Crowdnetic." (Second Amended Counterclaim ("SACC"), Dkt. No. 31 at 3.)

Albright admits that effective January 2014, pursuant to the Purchase Agreement, she "sold her interests in NowStreet to Crowdnetic, resulting in Crowdnetic owning 100% of the Member Interests of NowStreet." (SACC at 2.) But Albright claims that she agreed to sign the Purchase Agreement, and a related Unit Option Agreement ("Option Agreement"),[1] only after relying on representations from Cox in mid to late 2013 regarding Albright's continued employment with Crowdnetic. (SACC ¶ 30.)

Albright first received drafts of the Purchase Agreement and Option Agreement on December 30, 2013. She claims that while the Purchase Agreement itself made no reference to any other agreement to continue to employ Albright, Cox "repeatedly represented to Albright that Crowdnetic was not buying NowStreet, but rather she was buying Albright, and Cox falsely represented to Albright that the deal needed to be structured in this manner for tax reasons." (SACC ¶ 27.) As of January 8, 2014, Albright claims that she had an agreement (what she refers to as the "January 2014 Employment Agreement") with Crowdnetic to work as a key executive through August 1, 2016—unless she was terminated for cause—at a salary of $120,000 annually.[2] Albright alleges that under her agreement with Crowdnetic, her "executive position at Crowdnetic would be safe for at least three years so long as she continued to perform satisfactorily," and that Albright was to receive "founders' shares" and "a long term employment contract as a key executive of Crowdnetic." (SACC at 4.) On this point, Albright quotes an

---

[1] The Option Agreement between Crowdnetic and Albright provided Albright with options to purchase membership interests in Crowdnetic.

[2] Albright quotes from an August 12, 2013 email from Cox to an attorney working on the merger of Crowdnetic and NowStreet, which stated: "Approximate salary to be paid once we raise a significant round/can afford it will be $120K base but this dependent on raise and other circumstances." (SACC ¶ 16.)

5

email from Cox which stated in part: "there is a minimum target that if hit would ensure that your contract / you wouldn't be let go, etc. So, there is a performance metric to protect against your fear." (SACC ¶ 30.) Albright believed such employment terms "would be memorialized by a formal written agreement entered into between Crowdnetic and Albright, but were binding as of when the NowStreet ownership was transferred by Albright to Crowdnetic." (SACC ¶ 30.)

Albright executed the Option Agreement on January 8, 2014, and executed the Purchase Agreement the next day. However, she did not receive or execute any written agreement regarding the terms of her continued employment, as Cox insisted that Crowdnetic could not afford the legal fees to create such a document until after the company's financing round was completed. And, Cox later informed Albright that her title would change from Chief Communications Officer at Crowdnetic to Editor-in-Chief at NowStreet. Cox also requested that Albright sign a 2-year non-compete agreement that referred to Albright as a "consultant." Albright refused.

Crowdnetic's financing round was completed on February 15, 2014. Soon thereafter, Cox told Albright that she would send her a proposed employment agreement, but would need to "refigure" her compensation due to investor concern that Albright's compensation was too high. Cox proposed a reduction in Albright's salary from $120,000 to $100,000 annually, which Albright rejected. Cox also sent Albright a draft employment agreement, entitled "Consulting Agreement," which provided for a one-year term of employment and allowed Crowdnetic to terminate Albright's employment at any time, with or without cause. (SACC ¶ 37.) Albright refused to sign this document, advising Cox "that the draft Consulting Agreement was not acceptable, as it provided for a term of one year rather than the agreed term through August 1,

6

2016, and also allowed Crowdnetic to terminate Albright's employment with or without cause, at any time, upon 30 days' notice." (SACC ¶ 38.)

On May 13, 2014, following the conclusion of the LendIt Conference, Albright advised Cox "that she was unwinding the transactions involving the sale of NowStreet to Crowdnetic as Cox could no longer be trusted to perform or document the January 2014 Employment Agreement, and requested that Crowdnetic return NowStreet to Albright and the Written Merger Documents unwound." (SACC ¶ 40.) The next day, additional members of LendIt asked Cox to resolve Crowdnetic's dispute with Albright over ownership of NowStreet, emphasizing that Albright was a co-founder of LendIt and "an integral part of the LendIt team." (SACC ¶ 41). However, on May 28, 2014, Cox wrote LendIt to inform them that Crowdnetic, as the owner of NowStreet and 1/3 member of LendIt, was terminating Albright as manager of LendIt, and replacing her with Cox.

## LEGAL STANDARDS

In determining whether to dismiss a complaint for failure to state a claim, a court must "construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009). But to survive a motion to dismiss, a complaint must plead sufficient facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)). Unless a plaintiff's well-pleaded allegations have "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949

7

(citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955)). Evaluating the plausibility of a plaintiff's claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950 (citation omitted).

In evaluating a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns Inc. v. Shaar Fund. Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007) (internal citations omitted).[3]

## DISCUSSION

The court first addresses Albright's motion to dismiss Crowdnetic's second and third causes of action, before turning to Crowdnetic's motion to dismiss Albright's counterclaim.

### I. Albright's Motion to Dismiss Crowdnetic's Second and Third Causes of Action

As noted above, Crowdnetic moves for declaratory judgment, and also brings five claims for compensatory and punitive damages. Albright has moved to dismiss two of those claims: (1) tortious interference with contract (Count II), and (2) tortious interference with business relations (Count III). For the reasons below, the motion is denied in its entirety.

A. Crowdnetic's Second Cause of Action: Tortious Interference with Contract

Under New York law, a claim for tortious interference requires "the existence of a valid contract between plaintiff and a third party, defendant's knowledge of the contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *IMG Fragrance Brands, LLC v.*

---

[3] Because the Purchase Agreement was possessed by plaintiff and is attached to the complaint—Compl. ¶ Ex. A, Dkt. No. 23-1—the court may consider it in deciding the instant motion. The court may similarly consider the Limited Liability Company Operating Agreement of LendIt Conference, LLC (the "LendIt Agreement"), as it is referenced and relied upon by both sides in bringing the complaint and counterclaim.

*Houbigant, Inc.*, 679 F. Supp. 2d 395, 405-06 (S.D.N.Y. 2009) (citing *Lama Holding Co. v. Smith Barney Inc. et. al.,* 88 N.Y.2d 413, 424 (1996)).[4] In moving to dismiss, Albright argues that while the complaint contains conclusory allegations of misconduct causing LendIt to breach "its contractual relationship with Crowdnetic," it fails to actually identify the existence of any valid contract between LendIt and Crowdnetic—thus failing to state a claim under New York law.

In the second cause of action, Crowdnetic claims that "as the owner of NowStreet, [it] has a contractual relationship with LendIt." (Compl. ¶ 74.) Crowdnetic claims that Albright was aware of Crowdnetic's contractual relationship with LendIt, and that Albright "intentionally interfered with Crowdnetic's contractual relationship with LendIt." (Compl. ¶¶ 75-76.) The complaint adds: "Among other things, Albright caused LendIt to breach its contractual relationship with Crowdnetic by withholding documents and other information from Crowdnetic and denying Crowdnetic other rights it has as the owner of a member of LendIt." (*Id.* ¶ 76; *see also* ¶ 56.) As a result, Crowdnetic seeks damages of more than $1.8 million.

Crowdnetic argues that the complaint sufficiently pleads the existence of a valid contract between itself and a third party—namely, the LendIt LLC Agreement. According to Crowdnetic, after gaining control over Albright's 1/3 interest in LendIt through Crowdnetic's purchase of NowStreet, it had "a contractual relationship with LendIt." It claims that this contractual relationship existed because it "stepped into [Albright's] shoes as the beneficial owner of that 1/3 membership interest – including all rights under the LendIt LLC Agreement," or because it became NowStreet's "legal representative" vis-à-vis LendIt after completing the NowStreet

---

[4] The parties have assumed that New York law governs the claims at issue in the instant motions, which is sufficient to establish choice of law. *See Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345 (RJS), 2009 WL 755292, at *6 n.6 (S.D.N.Y. Mar. 20, 2009). The court therefore applies New York law throughout this opinion.

Purchase Agreement.  (Dkt. No. 42 at 6.)  Alternately, Crowdnetic claims that it may bring a

tortious interference with contract claim "based on breaches of the LendIt LLC Agreement

because it is an intended beneficiary of that Agreement."  (*Id.* at 7.)

    The court concludes that Crowdnetic states a claim for tortious interference with contract.

The complaint alleges that, through the execution of the Purchase Agreement and the acquisition

of NowStreet, Crowdnetic acquired all of Nowstreet's assets, including its 1/3 membership

interest in LendIt.  (Compl. ¶¶ 15, 19, 53-56, 59, 74-76.)  On the face of the complaint, and

taking the allegations as true, Crowdnetic's predecessor in interest—NowStreet—*was* a party to

the LendIt LLC Agreement.  And that agreement was binding on, and inured to the benefit of,

NowStreet's "legal representatives, successors, and permitted assigns."  (Dkt. No. 41 at Ex. A,

Art. 11.5.)  In such a scenario, the complaint adequately pleads the existence of a valid contract,

as well as the circumstances of Albright's alleged interference with that contractual relationship.

This is sufficient to meet the standards of pleading at this stage of the case.[5]  *See Wells Fargo*

*Bank N.W., N.A. v. Energy Ammonia Transp. Corp.,* No. 01–CV–5861, 2002 WL 1343757, at

*1-2 (S.D.N.Y. June 18, 2002) (granting motion to dismiss tortious interference with contract

claim when defendants were "neither parties to, nor third-party beneficiaries of [the contract],"

but denying similar motion to dismiss when "defendants (or more precisely, their predecessor in

---

[5] By contrast, the court rejects Crowdnetic's newfound attempt to save the claim based on its alleged status as a third party beneficiary.  Under New York law, in order to qualify as a third-party beneficiary with standing to bring a claim for tortious interference with contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party. *Subaru Distribs. Corp. v. Subaru of Am., Inc.,* 425 F.3d 119, 124 (2d Cir. 2005). The parties' intention "to benefit the third party must appear from the four corners of the instrument. 'The terms contained in the contract must clearly evince an intention to benefit the third person who seeks the protection of the contractual provisions.'" *See Debary v. Harrah's Operating Co.,* 465 F. Supp. 2d 250, 262-64 (S.D.N.Y. 2006) (quoting *Travelers Indem. Co. of Conn. V. Losco Grp., Inc.,* 150 F. Supp. 2d 556, 561 (S.D.N.Y. 2001)). Crowdnetic does not allege that it was named in the LendIt LLC Agreement, and there is nothing on the face of that agreement to benefit Crowdnetic. (*See* Dkt. No. 41 at Ex. A.) Crowdnetic cannot qualify as a third party beneficiary under these circumstances.

interest) were parties to the [contract], and . . . otherwise adequately allege the elements of a tortious interference claim").

### B. Crowdnetic's Third Cause of Action: Tortious Interference with Business Relations

The court also denies Albright's motion to dismiss the claim for tortious interference with business relations.

Under New York law, to state a claim for tortious interference with business relations, a plaintiff must allege that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 211 (S.D.N.Y. 2014) (citing *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)). The "elements of tortious interference with prospective economic relations are similar to those of tortious interference with contract, except that the defendant's conduct must be more culpable for a claim of tortious interference with a prospective contract." *Ace Arts, LLC v. Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 452-53 (S.D.N.Y. 2014) (internal citations and quotation marks omitted).

In the third cause of action, Crowdnetic claims that "Crowdnetic had business relations with various third parties, including Lend Academy." (Compl. ¶ 83.) Crowdnetic alleges that "Albright wrongfully interfered with those business relations by, among other things, claiming ownership of NowStreet without legal justification, deleting Crowdnetic emails, and cutting off Crowdnetic's access to the LendIt Dropbox and various social media outlets." (Compl. ¶ 84; *see also id.* ¶¶ 37-52.) One example of this interference cited by Crowdnetic is a May 19, 2014 email from Albright to the owners and managers of LendIt, in which she wrote: "I have elected

11

to unwind the transactions as between Crowdnetic and myself.  The result of this unwinding would be to return ownership and control of NowStreet to me.  I maintain my role as manager of LendIt."  (Compl. ¶ 59.)  Crowdnetic claims that "[a]s a result of Albright's actions, Lend Academy will no longer provide a direct feed of its blog to Crowdnetic's Lendvious website[,]" and "has suspended Crowdnetic's access to information previously made available to it as owner of NowStreet.  (Compl. ¶¶ 61-62.)  Additionally, as a result of Albright's actions, Crowdnetic remains unable to access parts of NowStreet's social media accounts, and significant information concerning LendIt's business operations contained in the LendIt Dropbox.  Crowdnetic seeks more than $2.6 million in damages on these claims.

Albright claims that dismissal of this claim is warranted since Crowdnetic fails to allege that she caused injury to an identified business relationship.  She further argues that the complaint is devoid of any facts from which one can infer a causal relationship between the statements in the May 19 email from Albright to LendIt and the interference with the relationship with Lend Academy which was allegedly caused by such email, and claims that this email in and of itself does not qualify as acting with "wrongful means" under New York law.

The court disagrees with this characterization of the complaint.  Crowdnetic has alleged that Albright's actions caused damage to a number of Crowdnetic's specifically identified business relationships, including those with Lend Academy and various social media companies.  (FAC ¶ 43.)  The complaint alleges that Albright did so for the wrongful purpose of damaging Crowdnetic.  It is reasonable to infer that a May 19, 2014 email from Albright containing alleged misrepresentations regarding her ability to "unwind" the NowStreet transaction or her role at LendIt would cause injury to Crowdnetic's business relationships concerning NowStreet or LendIt, as companies like Lend Academy would no longer know with whom to properly conduct

business—Crowdnetic or Albright.   *See Sidney Frank Importing Co.*, 998 F. Supp. 2d at 213 ("In light of the details provided in the FAC . . . and in light of the multiple cases making allowance for misrepresentations to satisfy the 'wrongful means' element, the Court finds that the FAC alleges sufficient facts satisfying this element.")   Moreover, the pleadings are not limited to this single email, but also detail Albright's alleged secret and malicious tampering with NowStreet's social media accounts.   Such actions can qualify as interference with business relations for present purposes, as Crowdnetic acquired these relationships when it purportedly purchased NowStreet.[6]   The motion to dismiss this claim is denied.

## II.   Crowdnetic's Motion to Dismiss the Second Amended Counterclaim

### A.   Count V: Albright's Claim for Tortious Interference with Business Relations

Crowdnetic is not the only party bringing a claim for tortious interference with business relations.   Albright asserts her own, claiming that from May 2014 through the present, Crowdnetic has interfered with her business relationship with LendIt.   Crowdnetic did so "through wrongful means, including economic pressure on LendIt, threats of litigation against LendIt and its affiliates, including its other Members, and attempted extortion."   (SACC ¶¶ 73-83.)   Such actions were allegedly taken by Crowdnetic "with a wrongful purpose and with malice, *i.e.* to deprive Albright of any economic benefit from LendIt unless and until Albright accesses to the demands of Crowdnetic, by relinquishing Albright's *bona fide* claim against Crowdnetic to retain title to NowStreet and NowStreet's interest in LendIt."   (*Id.*)   Albright

---

[6] Albright argues that, to the extent Crowdnetic is a proper party to state claims against her for tortious interference with contract or business relations, such a claim must be submitted to arbitration under the terms of the LendIt LLC Agreement.   Indeed, it appears that NowStreet has already commenced arbitration against additional LendIt members and managers, based in part on circumstances arising in part from the action before this court.   *See* Dkt. No. 41 at ¶ 7.   To the extent the LendIt LLC Agreement may require mandatory arbitration on the instant claims, Albright is of course entitled to file a motion to stay these claims and compel arbitration.   But no such motion is currently before the court.

specifically alleges that Crowdnetic tortiously interfered with her relationship with LendIt by: (1) disclosing LendIt financial information through the filing of the original unredacted complaint in the instant action on May 29, 2014 (SACC ¶ 75); (2) filing an amended complaint in July 2014 containing additional claims against Albright based on her actions as a LendIt manager, which required LendIt to indemnify her for defense costs (SACC ¶ 76); (3) attempting to "extort" Albright by informing her that Crowdnetic would consent to her continued employment at LendIt after June 2014 only if Albright dropped all claims in the instant action (SACC ¶ 77); and (4) demanding of both LendIt and Albright that Crowdnetic be allowed to retain a portion of NowStreet membership interests as a condition of refraining from suing LendIt and its affiliates (SACC ¶¶ 78-83.)

Under the New York law discussed above, Albright has sufficiently pleaded a claim for tortious interference with business relations. Crowdnetic notes that all of the allegations regarding its supposed tortious interference occurred either the day after, or months after, Albright was fired (by Crowdnetic's CEO) from her position as a manager at LendIt. Crowdnetic thus argues that Albright has failed to plead that she "had business relations with a third party," as she was no longer working with LendIt at the times of the alleged interference. *See Sidney Frank Importing Co.*, 998 F. Supp. 2d at 211. But this reading of the complaint is too narrow, and is premised on Crowdnetic's position—hotly disputed at present—that Albright had "already been *duly and rightfully* replaced as NowStreet's appointed LendIt Manager on May 28, 2014." (Dkt. No. 36 at 22 (emphasis added).) Of course, a large part of Albright's case hinges on the claim that she was *not* "rightfully" fired by Crowdnetic from her role at LendIt. And, as the very case cited by Crowdnetic on this point states, "'[t]ortious interference with business relations' applies to those situations where the third party would have entered into *or extended* a

14

contractual relationship with the plaintiff but for the intentional and wrongful acts of the defendant.'" *Icahn v. Lions Gate Entm't Corp.*, 31 Misc. 3d 1205(A), 929 N.Y.S.2d 200 (Sup. Ct. 2011) (quoting *Newsday, Inc. v Fantastic Mind, Inc.*, 237 A.D.2d 497 (2d Dep't 1997) (emphasis added)).

Though Crowdnetic argues otherwise, the SACC is replete with allegations of a longstanding business relation between Albright and LendIt, which plausibly could have extended but for Crowdnetic's interference. (*E.g.*, SACC ¶¶ 11, 13, 14). Crowdnetic's motion to dismiss this claim is therefore denied.

### B. Count I: Albright's Breach of Contract Claim

Albright claims that "the Written Merger Documents and the January 2014 Employment Agreement were integrated transactions and contractual agreements, entered into at the same time as part and parcel of the sale by Albright of NowStreet." (SACC ¶ 52). She claims that "Crowdnetic has failed and refused to perform most of the terms of the January 2014 Employment Agreement," noting that "Crowdnetic refers to the employment relationship between Crowdnetic and Albright as a mere 'possibility.'" (*Id.* (citing FAC ¶ 22)) She seeks rescission, or alternately compensatory damages of at least $1 million. Crowdnetic moves to dismiss the claim, arguing that (1) the parties did not reach a sufficiently definite agreement, and (2) any such agreement would be void without a writing under the Statute of Frauds.

Under New York law, a plaintiff claiming breach of contract must adequately allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal citations omitted). Additionally, the purported agreement must be sufficiently "definite" to be enforceable.

15

*Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 609 (S.D.N.Y. 2010). "The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to.... [I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Id.* (internal citations omitted); *accord Carruthers v. Flaum*, 450 F. Supp. 2d 288, 309 (S.D.N.Y. 2006) ("If the parties have not reached a final agreement on the fundamental terms of the deal, no *contract* has been formed") (emphasis in original).

Additionally, the New York Statute of Frauds states that "'[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking ... [b]y its terms is not to be performed within one year from the making thereof.'" *Caruso v. Grace*, No. 11 CIV. 2353, 2011 WL 4472479, at *6-7 (S.D.N.Y. Sept. 27, 2011) (quoting N.Y. Gen. Oblig. Law § 5–701(a)(1) (McKinney 2011)). The law "is well-settled that for a contract to fall within this provision of the Statute of Frauds, there must be absolutely no possibility of performance of the contract within one year." *Id.* (internal citations omitted). New York courts "generally construe the statute of frauds narrowly, voiding only those oral contracts 'which by their very terms have absolutely no possibility in fact and law of full performance within one year.'" *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 110 (2d Cir. 2014) (quoting *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 454 (1984)). As the New York Court of Appeals has explained:

> Wherever an agreement has been found to be susceptible of fulfillment within [one year], in whatever manner and however impractical, this court has held the one-year provision of the Statute to be inapplicable, a writing unnecessary, and the agreement not barred. So, for example, in the following situations, the oral agreements which were challenged under the Statute of Frauds were all upheld as fully performable within one year:

16

> where either party had the option to terminate the agreement on seven
> months' notice . . . where defendant had the option to discontinue at any
> time the activities upon which the agreement was conditioned  . . . where
> employment was terminable for any just and sufficient cause wherever
> dismissal was deemed necessary for the welfare of the company. . . Where
> one or both parties have such an explicit option to terminate their
> agreement within one year, that agreement is, by its own terms, capable of
> completion within that period and is not governed by the Statute. But, of
> course, there is no such analogous option to breach. Rather, a breach by
> definition can never constitute a mode of fully performing an agreement.

*D & N Boening, Inc.*, 63 N.Y.2d at 455-56.

Here, as an initial matter, Crowdnetic argues that what Albright refers to as "the January 2014 Employment Agreement" was nothing of the kind, but was instead an indefinite "agreement to agree." Pointing to an August 2013 email from Cox cited in the counterclaim, which notes that Albright's $120,000 annual salary would be "dependent on raise and other circumstances," Crowdnetic claims that any purported agreement with Albright lacked sufficiently definite compensation terms, and that there was no "meeting of the minds" to form a contract between the parties. Crowdnetic similarly argues that statements from its CEO to Albright that Albright "would be 'protected so long as she performed her duties" and that "there is a minimum target that if hit would ensure that your contract/you wouldn't be let go" indicate a lack of definite, finalized terms. (SACC ¶ 30.)

On a motion to dismiss, this argument misses the mark. For one thing, the email stating that Albright's salary would depend on "raise and other circumstances" dates from August 2013, while Albright alleges that the definite terms of her employment agreement were finalized months later, in January 2014. For another, regardless of any earlier correspondence or statements cited in the counterclaim, paragraph 30 adequately pleads sufficiently definite terms that were "agreed [to] by Crowdnetic, and Albright as of January 8, 2014," including specific job responsibilities, salary, and the duration of the contract. This pleading covers a more specific

17

and definite bargain than a mere agreement to agree, and is all that is required at the motion to dismiss stage.

With regard to the Statute of Frauds, there is no dispute that any alleged agreement was an oral one; Albright admits that the Alleged Employment Agreement, if ever finalized, was supposed to be—but never was—memorialized in a writing. (SACC ¶ 30 ("[t]he…terms of employment would be memorialized by a formal written agreement entered into between Crowdnetic and Albright").) Crowdnetic argues that without such a writing, the duration of the alleged agreement—from January 8, 2014 through August 1, 2016—means that the agreement violates the Statute of Frauds, because there was no possible way for the agreement to be performed within one year. *See, e.g., DeSouza v. Andy Frain Servs., Inc.*, No. 12 CIV. 1308 WHP, 2012 WL 3245496, at *3 (S.D.N.Y. Aug. 6, 2012) (granting motion to dismiss because "any three-year oral employment agreement . . . would be unenforceable because it could not be performed within one year"). The key question before the court is thus whether there was any possibility that the contract could be fully performed within one year, saving it from the Statute of Frauds.

In her counterclaim, Albright does describe the agreement as "a long term employment agreement." (SACC at p. 3.) She also states that she refused to sign a proposed March 2014 "Consulting Agreement" precisely because "it provided for a term of one year rather than the agreed term through August 1, 2016, and also allowed Crowdnetic to terminate Albright's employment with or without cause, at any time, upon 30 days' notice." (SACC ¶ 38.) But with regard to the actual agreement from January 2014, Albright specifically alleges: "The stated term of the employment would continue until the end of the Option vesting period, August 1, 2016, *unless Albright was terminated by Crowdnetic terminated for 'cause.'*" (SACC ¶ 30

18

(emphasis added).)  Albright also claims that she was told that she "would be 'protected so long as she performed her duties," and that "there is a minimum target"—the specifics of which were left to the good faith discretion of Crowdnetic—that "if hit would ensure that your contract/you wouldn't be let go." (*Id.*; *see also* Dkt. No. 39 at 7-9.)

If Albright had pleaded simply that the agreement had to run, with no conditions, through August 1, 2016, Crowdnetic's argument would certainly be correct.  Similarly, if Albright's pleadings allowed merely for an interpretation that the agreement would end within one year only if Albright breached the contract, she could not escape the Statute of Frauds. *See D & N Boening, Inc.*, 63 N.Y.2d at 455-56 (noting that a "breach can in no way be equated with an option to discontinue or cancel, the exercise of which would constitute an alternative performance of the agreement").

But Albright pleads more.  She claims both that the employment term would last through 2016 "unless Albright was terminated by Crowdnetic for 'cause,'" and that the agreement included "a minimum target that if hit would ensure that your contract/you wouldn't be let go." This means that there were plausible contingencies—namely, termination for cause or the failure to hit a required "minimum target" before January 2015—which would allow the agreement to be completed within a year.  As a long line of New York cases have held, an oral contract that can be terminated by the defendant within one year may be removed from the Statute of Frauds. *See, e.g., S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 105-07 (2d Cir. 2009) (affirming holding that the Statute of Frauds does not apply where the defendant may terminate the contract within one year, because when "an oral agreement expressly provides that it may permissibly be terminated within one year by either party, such a termination is considered performance, rather than a breach; and such an agreement is not within the Statute of Frauds")

(citing *Blake v. Voight,* 134 N.Y. 69, 72, 31 N.E. 256, 256–57 (1892) and *North Shore Bottling Co. v. Schmidt & Sons,* 22 N.Y.2d 171, 175)); *D & N Boening, Inc.,* 63 N.Y.2d at 455-56 (holding Statute of Frauds inapplicable "where employment was terminable for any just and sufficient cause wherever dismissal was deemed necessary for the welfare of the company"); *Kroshnyi,* 771 F.3d at 110-11 (collecting cases).

Construing the pleadings in the light most favorable to Albright and taking them as true, the January 2014 agreement could have been completed—not merely breached—within one year, if Crowdnetic terminated Albright for cause or if a minimum target was not reached. The Statute of Frauds is therefore inapplicable, and Albright states a plausible claim for relief.

### C. Count II: Albright's Fraud Claims

By contrast, Albright fails to state a fraud claim, and count II of her counterclaim must be dismissed.

"To prove common law fraud under New York law, a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." *Century Pac., Inc. v. Hilton Hotels Corp.,* 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007), *aff'd,* 354 F. App'x 496 (2d Cir. 2009). Moreover, "[i]n alleging fraud ... a party must state with particularity the circumstances constituting fraud". Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a counterclaim must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292-93 (2d Cir. 2006). Finally, under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of

an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 614 (S.D.N.Y. 2010) (internal citations omitted).

In paragraph 56 of her counterclaim, Albright claims that she "relied to her detriment on the false and misleading statements, omissions, and actions of [Crowdnetic]," and proceeds to list the precise statements by Crowdnetic regarding her employment terms referenced in her breach of contract claim. In paragraph 57, she goes on to allege that she

is informed and believes that [Crowdnetic] attempted to conceal their intent to have Albright's 727,500 unvested Options (approximately 7.5% of Crowdnetic) terminate upon Albright's early termination by Crowdnetic without cause. This was done by drafting the vesting provisions in the January 2014 Option Agreement in a deliberately vague and ambiguous manner. Then, weeks later, after the Option Agreement was executed and delivered, along with 100% of the Member Interests in NowStreet, Counterdefendants revealed their true intentions, by unilaterally revising the signed Option Agreement and presenting it to Albright for 're-signing,' the changed language making it crystal clear that Albright's unvested Options would terminate immediately if her employment was terminated, with or without cause.

(SACC ¶ 57.) Albright adds that Crowdnetic "knew that these representations were false and misleading and made such representations and took such actions with the express intent to fraudulently induce Albright to sell and transfer her 100% ownership interest in NowStreet under the terms of the Purchase Agreement." (SACC ¶ 58.)

Under the law just stated, Albright fails to state a claim. First, the pleading in paragraph 56 fails to state a claim because it is entirely duplicative—and, in fact, often *verbatim*—to her breach of contract claim. It is true, as Albright notes, that the Second Circuit has at times allowed a party to maintain a claim sounding in fraud alongside a breach of contract claim. But to do so, a party must "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the

21

contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996). Paragraph 56 fails to allege facts sufficient to satisfy any of these conditions.

Paragraph 57 is similarly problematic, and cannot save the fraud claim. This paragraph really sounds in breach of contract, not fraud, based on a purported plan by Crowdnetic to later breach the terms of the Option Agreement. In her memorandum of law, Albright argues that though "as a general matter promises of future performance may not serve as the basis for a common law fraud claim under New York law, promises of future performance, made with a specific, preconceived undisclosed intent not to perform future promises, are actionable in a common law fraud cause of action." (Dkt. No. 39 at 10.) But this misstates the law. In fact, "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." *Telecom Int'l Am. Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) (citation and internal quotation marks omitted) (collecting cases); *see also Gutkowski*, 680 F. Supp. 2d at 614 (dismissing fraud claim when plaintiff pleaded that "defendant had no intention of fulfilling the agreement with Plaintiff, as his subsequent behavior demonstrates [and that] Defendant knew that his promises and assurances were false when he made them").

Albright fails to make out any case for fraud—let alone satisfy the heightened pleading standard of Rule 9(b). Her fraud claim is dismissed.

### D. Counts III-IV: Securities Fraud Claim

Just as Albright fails to meet the heightened pleading requirement of Rule 9(b) and fails to state a fraud claim, she also fails to meet the heightened pleading requirements of the Special Private Securities Litigation Reform Act ("PSLRA") when alleging securities fraud, and otherwise fails to state a securities fraud claim. Her claims for securities fraud under Section 10(b) and Rule 10b-5 must therefore be dismissed.

To state a claim for securities fraud, Albright must allege that Crowdnetic "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which she relied, and (5) that her reliance was the proximate cause of her injury." *ATSI,* 493 F.3d at 105. Additionally, these allegations must satisfy the heightened pleading standards of Rule 9(b) and the PSLRA, which require a plaintiff to "specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." 15 U.S.C. 78u-4(b).

Albright's counterclaim alleges that Crowdnetic violated Section 10(b) and Rule 10b-5 because it made "material misstatements and omissions and employed devices, schemes and artifices to defraud" her. (SACC ¶ 65.) Albright claims standing to bring such a claim in her capacity as a purchaser of membership interest in Crowdnetic through the Option Agreement. She further alleges that but for Crowdnetic's misrepresentations, she "would not have purchased the Options or entered into the other related transactions under the Written Merger Documents or the January 2014 Employment Agreement." (SACC ¶ 66.) She makes similar allegations under Georgia Uniform Securities Code § 10-5-50, by merely re-alleging "by reference all preceding paragraphs in the Counterclaim." (SACC ¶ 69.)

23

These allegations fail to state a claim for securities fraud.  First, while "membership interests" in an LLC may constitute "securities" for purposes of Section 10(b) and Rule 10b-5 under Second Circuit case law, those cases ruled that way when the suit was brought by "passive investors"—not, as here, where the plaintiff was meant to be (by her own description) "a key executive of Crowdnetic." *See U.S. v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008).  Second, and more fundamentally, even if the membership interests at issue might qualify as "securities," the entirety of Albright's securities fraud allegations consist only of a recitation of the legal elements of a securities fraud claim. *(See* SACC ¶ 65.)  Her counterclaim does not adequately identify a specific fraudulent misstatement upon which she reasonably relied in connection with the purchase of her membership interests, and must be dismissed.[7] *See Twombly*, 550 U.S. at 555 ("formulaic recitation of the elements of a cause of action will not do.").

The same analysis holds true for any cause of action under the Georgia Uniform Securities Code.  To the extent the Georgia Uniform Securities Code § 10-5-50 even allows for a private right of action,[8] this claim is dismissed as well.

### III.  Leave To Amend

In her memorandum of law opposing plaintiff's motion to dismiss the counterclaim, Albright requests leave to amend the second-amended counterclaim in the event that the court— as it has now—finds that the counterclaim fails to state certain claims.

---

[7] In her memorandum of law, Albright argues that "the core of the misrepresentations alleged in the SACC was the representation that Albright would be employed as a 'key executive of Crowdnetic' and would remain as such for at least 2 ½ years from the date of acquisition of the Options." (Dkt. No. 39 at 20 (citing SACC ¶ 56.).)  But this claim, like the common law fraud claim, is merely duplicative of Albright's breach of contract claim.  The alleged misrepresentation concerns Albright's employment agreement, not any membership interests or other securities.  This is not sufficient to state a claim under Section 10(b) and Rule 10b-5.

[8] The court found almost no case law addressing this question, but the little case law that does exist points to a conclusion that there is no such cause of action. *See Abrams & Wofsy v. Renaissance Inv. Corp.*, 820 F. Supp. 1519, 1529 (N.D. Ga. 1993) (interpreting previous iteration of this statute and holding that it did not provide for a private cause of action).

24

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend should be "freely" given "when justice so requires." "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182 (1962); *accord McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200–02 (2d Cir. 2007).

Despite this relatively liberal standard, Albright's request to amend the counterclaim is denied. Albright has already amended her counterclaim twice, and has not managed to cure the deficiencies identified above with respect to her fraud claims. To allow a third amendment would unduly prejudice plaintiffs in this action. *See DeBlasio v. Merrill Lynch & Co., Inc.,* No. 07 Civ 318(RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009) ("Rule 15(a) is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion."); *Gutkowski v. Steinbrenner,* 680 F. Supp. 2d 602, 609 (S.D.N.Y. 2010) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.") (internal quotation marks and citations omitted).

## **CONCLUSION**

Albright's motion to dismiss counts II and III of the complaint is denied in its entirety. Crowdnetic's motion to dismiss the counterclaim is granted with respect to the common law fraud and securities fraud claims, but is denied with respect to the breach of contract and tortious interference with business relations claims.

This resolves the motions listed as items 32 and 34 on the docket.

SO ORDERED.

Dated:   New York, New York
         August 17, 2015

_____
THOMAS P. GRIESA
U.S. District Judge